UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW JERSEY

| | |
|---|---|
| GERRESHEIMER GLASS INC., | ) |
| Plaintiff, | ) **Civ.** |
| | ) |
| v. | ) **CIVIL ACTION** |
| | ) |
| EXPEDITORS INTERNATIONAL OF WASHINGTON, INC., | ) **JURY TRIAL DEMANDED** |
| | ) |
| Defendant. | ) |

**COMPLAINT**

Plaintiff Gerresheimer Glass Inc. ("Gerresheimer" or "Plaintiff"), by and though his undersigned counsel, for its Complaint against Defendant Expeditors International of Washington, Inc. ("Expeditors" or "Defendant"), states as follows:

**THE PARTIES**

1. Gerresheimer is an international manufacturer and distributor of glass products. Gerresheimer is incorporated in Delaware and has its principal place of business in Vineland, New Jersey, at 537 Crystal Avenue, Vineland, New Jersey 08360.

2. Expeditors is incorporated under the laws of the State of Washington, with its corporate headquarters located at 1015 Third Avenue, Seattle, Washington 98104.

3. Expeditors' website lists its core services as "Supply Chain," "Transportation," "Customs and Compliance," and "Warehousing and Distribution."

**JURISDICTION AND VENUE**

4. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, because Expeditors is a citizen of the State of Washington, while Gerresheimer is

a citizen of Delaware with its principal place of business in the State of New Jersey. The amount in controversy exceeds $75,000.00.

5. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391, because Expeditors regularly conducts business in this District, and the events giving rise to this action occurred in connection with an agreement that was formed, and required performance of services for a company located, in this District.

## FACTS COMMON TO ALL COUNTS

6. Since at least 2002 and until February 2022, Gerresheimer contracted with Expeditors to provide customs brokerage and related services for imports arriving in the United States ("the Brokerage Contract").

7. Expeditors' duties under the Brokerage Contract included:

   a. ensuring that all applicable paperwork and payments required by the United States Customs and Border Protection ("CBP") were completed in full;

   b. providing the necessary documents to authorize the release of the goods from the port, including a "delivery advice" ("DA") – a form containing data about the goods, including quantity, weight, date of discharge, etc. – or similar document, to the carrier hired to transport Gerresheimer's goods to the customer ("pick-up carrier");

   c. avoiding penalties, including demurrage (daily penalties charged by the applicable port, railway yard, or ocean carrier for delayed customs clearance for incoming shipments), caused by any delay in Expeditors' customs-clearing or in Expeditors' otherwise facilitating the timely processing and removal of goods from port.

8. In exchange for Expeditors' performance of these services, Gerresheimer agreed to pay Expeditors a brokerage fee.

9. While the parties did not reduce the Brokerage Contract to a writing, the Brokerage Contract was formed by the parties' oral agreement and course of dealing since at least 2002.

10. Expeditors' timely performance under the Brokerage Contract was essential in moving Gerresheimer's goods to its customers according to plan, since any delay or error in clearing customs or in having the goods released to the pick-up carrier could lead to demurrage charges to Gerresheimer or its customers, an unexpected and often substantial expense.

11. Until September 2021, Expeditors performed its promised brokerage services under the Brokerage Contract.

12. However, between September and December 2021, Expeditors failed to provide the brokerage services required by the Brokerage Contract, causing Gerresheimer's goods to incur demurrage costs.

13. Expeditors' performance between September and December 2021 was substandard, characterized by chronic delays and shoddy, error-filled work, including the following.

14. Expeditors regularly failed to file the import entry documents in accordance with industry standards even though they were provided all the documents and information required to file timely. Expeditors often failed to file the required documents before demurrage began to accrue.

15. In addition, several times, Expeditors misinformed the pick-up carrier that customs had been cleared for a shipment.

16. In those cases, the pick-up carrier's trucker would arrive at the port to collect the goods and would discover that customs had not been cleared. The pick-up carrier would then have

to reschedule a trucker to return to the port and start the removal process again, all at additional expense to Gerresheimer.

17. Expeditors also caused delays by failing to timely send DAs to the pick-up carrier to enable the pick-up carrier to remove the goods from the port.

18. Although Expeditors received all the relevant data to complete the DAs even before the goods arrived in the United States, Expeditors regularly delayed in sending the DAs to the pick-up carrier until the goods had already arrived at the port.

19. Because the pick-up carrier would not receive the DAs until the goods were already sitting at the port, the pick-up carrier would have to scramble to find truckers available on extremely short notice to pick up the goods before demurrage would begin to accrue.

20. Often, Expeditors did not send the DA until *days or weeks after demurrage began to accrue.*

21. In fact, for two shipments that were unloaded at the port in early October 2021, Expeditors delayed nearly *two months* before it finally provided DAs to the pick-up carrier on November 30. Because of Expeditors' inexplicable delay, these two shipments alone accrued demurrage charges of over $52,000.

22. Expeditors' DAs were not only often late, but also frequently riddled with errors, such as obviously misstating the quantity or weight of goods, or the estimated time of arrival at port.

23. Because of these errors, the DAs had to be corrected and resent to the pick-up carrier to enable the removal of the goods from the port.

24. The pick-up carrier's trucker would often arrive at the port, discover the DA had a glaring error, and then have to wait until Expeditors was notified of the error and prepared and sent a new DA.

25. These delays, besides disrupting the delivery of goods to Gerresheimer's waiting customers, contributed to mounting demurrage.

26. Expeditors also caused delay by failing to pay demurrage charges that had already accrued. Without full payment of past demurrage, the goods were not permitted to be released from the port, compounding the demurrage even more.

27. In all, Expeditors caused Gerresheimer to incur $485,348 in damages between September and December 2021 due to excess demurrage charges.

28. Most of these demurrage charges required Gerresheimer to pay to have the products released from the port or railway. The remainder were charged to Gerresheimer's customer, which in turn sought and received reimbursement from Gerresheimer.

29. From September through December 2021, both Gerresheimer and the pick-up carrier sent repeated notices to Expeditors about these failures and the resultant accrual of demurrage.

30. Gerresheimer and the pick-up carrier repeatedly sought an explanation from Expeditors why the delays and errors kept recurring.

31. Expeditors was largely non-responsive to these communications, at times leaving Gerresheimer and the pick-up carrier waiting for hours or days without knowing the status of the goods that were sitting at the port or railway.

32. On June 16, 2022, and again on September 23, 2022, Gerresheimer's counsel sent demand letters to Expeditors for reimbursement of the demurrage charges. Gerresheimer asserted in those letters:

   a. Expeditors was contractually bound to handle Gerresheimer's customs clearance services. By failing to perform those services as promised, Expeditors directly caused the demurrage Gerresheimer was required to pay;

   b. While the damages were mounting, Gerresheimer had sent Expeditors numerous emails detailing Expeditors' failures and the resulting demurrage;

   c. Because Expeditors had failed to properly perform the customs brokerage services it had been hired to provide, Expeditors had not earned the money it claimed to be owed; and

   d. Between September 2021 and January 2022, Expeditors had never responded to Gerresheimer's complaints or notices by asking for further proof of Expeditors' errors and delays.

33. Gerresheimer also asked Expeditors to specify any additional documents Expeditors needed to confirm the basis for Gerresheimer's demand.

34. Finally, in its September 23, 2022 letter, Gerresheimer invited Expeditors to cooperate with Gerresheimer to reach an amicable resolution of the dispute, while advising that absent such a resolution, Gerresheimer would proceed with litigation to recover its losses caused by Expeditors' failure to perform.

35. Gerresheimer received an unresponsive letter from Expeditors' outside counsel in reply to Gerresheimer's June 16, 2022 letter, and no response whatsoever to its September 23, 2022 letter.

## COUNT I – BREACH OF CONTRACT

36. Gerresheimer incorporates the foregoing statements as if set forth fully herein.

37. Gerresheimer and Expeditors had a binding contract, the Brokerage Contract.

38. Under the Brokerage Contract, Expeditors was obligated to provide customs brokerage and related services for Gerresheimer's imports, including from September through December 2021.

39. Expeditors' required services under the Brokerage Contract included ensuring timely clearing of customs by submitting all applicable paperwork and payments, facilitating the timely release of Gerresheimer's goods by providing necessary documentation to the pick-up carrier, and avoiding accrual of demurrage for Gerresheimer's goods.

40. In exchange for Expeditors' performance of these services, Gerresheimer agreed to pay Expeditors a brokerage fee.

41. Between September and December 2021, despite Gerresheimer's payment of the brokerage fee, Expeditors failed to provide the promised services by regularly, and without any legitimate justification, failing to timely clear customs, to provide timely and correct DAs to the pick-up carrier, and otherwise to facilitate the timely release of Gerresheimer's goods without incurring demurrage.

42. Expeditors' failure to provide the promised services constituted a breach of the Brokerage Contract.

43. As a direct and proximate result of Expeditors' breach of the Brokerage Contract, Gerresheimer incurred damages in the amount of $485,348 due to excess demurrage charges.

**WHEREFORE**, Gerresheimer seeks judgment in its favor against Expeditors for: (1) compensatory damages; (2) incidental and consequential damages as permitted by law; (3) interest; (4) punitive damages; (5) Gerresheimer's attorneys' fees and costs; and (6) all such other further relief as the Court may deem just and equitable.

### COUNT II – BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

44. Gerresheimer incorporates the foregoing statements as if set forth fully herein.

45. Expeditors breached the covenant and duty of good faith and fair dealing that is implied in all New Jersey contracts by, among others, failing to timely clear customs, to timely provide correct DAs to the pick-up carrier, or to avoid accrual of demurrage due to delays in releasing Gerresheimer's goods.

46. By its conduct and omissions, Expeditors acted in a manner unfaithful to the agreed purposes and to the parties' reasonable expectations under the Brokerage Contract.

47. As a direct and proximate result of Expeditors' breach of the covenant and duty of good faith and fair dealing implied in the Brokerage Contract, Gerresheimer incurred and was required to pay hundreds of thousands of dollars in demurrage.

**WHEREFORE**, Gerresheimer seeks judgment in its favor against Expeditors for: (1) compensatory damages; (2) incidental and consequential damages as permitted by law; (3) interest; (4) punitive damages; (5) Gerresheimer's attorneys' fees and costs; and (6) all such other further relief as the Court may deem just and equitable.

### COUNT III -- PROFESSIONAL NEGLIGENCE

48. Gerresheimer incorporates the foregoing statements as if set forth fully herein.

49. From September through December 2021, Expeditors held itself out as providing professional customs brokerage and related services to Gerresheimer.

50. In undertaking to perform the customs brokerage and related services, Expeditors explicitly and/or implicitly represented that it had and would use the knowledge, skill, and judgment ordinarily possessed and used by the average customs broker in good standing in similar communities as of the time Expeditors undertook to provide such services to Gerresheimer.

51. By undertaking to provide such services to Gerresheimer, Expeditors owed a duty of care to Gerresheimer.

52. Expeditors knew that Gerresheimer would rely on Expeditors' claimed expertise and skill in providing customs brokerage and related services, and the harm Gerresheimer sustained because of Expeditors' substandard performance was foreseeable.

53. Expeditors negligently performed substandard work and thereby breached its duty of care to Gerresheimer, including by regularly and without any legitimate justification failing to timely clear customs, provide timely and correct DAs to the pick-up carrier, and otherwise facilitate the timely release of Gerresheimer's goods without incurring demurrage.

54. Expeditors failed to conform its performance to the standard of competence, skill, and professionalism ordinarily possessed and exercised by the average customs broker in similar communities at that time.

55. Expeditors failed to exercise judgment in its decisions and actions respecting Gerresheimer's goods in conformance with the judgment of an average customs broker in similar circumstances.

56. Expeditors' substandard, negligent performance directly and proximately caused injury to Gerresheimer by incurring hundreds of thousands of dollars in demurrage relating to Gerresheimer's goods.

57. But for Expeditors' substandard, negligent performance, Gerresheimer would not have incurred the demurrage.

**WHEREFORE**, Gerresheimer seeks judgment in its favor against Expeditors for: (1) compensatory damages; (2) incidental and consequential damages as permitted by law; (3) interest; (4) punitive damages; (5) Gerresheimer's attorneys' fees and costs; and (6) all such other further relief as the Court may deem just and equitable.

### COUNT IV – UNJUST ENRICHMENT

58. Gerresheimer incorporates the foregoing statements as if set forth fully herein.

59. Gerresheimer paid brokerage fees to Expeditors with the expectation that Expeditors would perform adequate customs brokerage and related services to Gerresheimer.

60. Expeditors failed to perform adequate customs brokerage and related services to Gerresheimer between September and December 2022.

61. For Expeditors to retain the benefit it received from Gerresheimer would be unjust.

**WHEREFORE**, Gerresheimer seeks judgment in its favor against Expeditors for: (1) compensatory damages; (2) incidental and consequential damages as permitted by law; (3) interest; (4) punitive damages; (5) Gerresheimer's attorneys' fees and costs; and (6) all such other further relief as the Court may deem just and equitable.

## **JURY DEMAND**

Gerresheimer hereby respectfully requests a trial by jury on all its claims.

Dated: April 20, 2023

Respectfully submitted,

FLASTER/GREENBERG P.C.

*/s/ Jeffrey A. Cohen*
Jeffrey A. Cohen, Esquire
Daniel C. Epstein, Esquire
1810 Chapel Avenue West
Cherry Hill, New Jersey 08002
T: (215) 279-9907
F: (215) 576-8188
Jeffrey.cohen@flastergreenberg.com
Daniel.epstein@flastergreenberg.com
*Counsel for Plaintiff Gerresheimer Glass Inc.*